AE

ALFONSO WORTHEN,          )
                         )
          Plaintiff,      )
                         )
     v.                   )     Case No. 04 C 7051
                         )
JO ANNE B. BARNHART,      )     Magistrate Judge Arlander Keys
Commissioner of Social    )
Security,                 )
                         )
          Defendant.      )

## MEMORANDUM OPINION AND ORDER

This social security appeal is before the Court on cross-
motions for summary judgment.  The plaintiff, Alfonso Worthen,
seeks reversal of the decision of the Commissioner of Social
Security denying his claim for Disability Insurance Benefits
("DIB") and Supplemental Security Income ("SSI"); in the
alternative, Mr. Worthen asks the Court to remand the matter for
further proceedings before an ALJ who has not yet heard his
claim.  The Commissioner, on the other hand, asks the Court to
affirm her decision to deny benefits.  For the reasons set forth
below, the Court will grant Mr. Worthen's motion, deny the
Commissioner's motion, and remand the case with directions to
award benefits.

### Facts & Procedural History

This case has a long and fairly complex history; the record

is roughly 700 pages and includes four administrative hearing transcripts, three administrative law judge decisions, two Appeals Council remands, and countless medical records covering a period of more than twenty years. Although this case seeks review of just the last decision issued by the ALJ, in order to give context to that decision, the Court will explore and detail the evidence introduced throughout the earlier hearings, as well as the analysis and findings included in the preceding decisions.

A.   Round One - The Application and
     The First Administrative Hearing

On February 20, 1996, Alfonso Worthen, then 44 years old, applied for DIB and SSI, alleging that he had become disabled as of May 22, 1995, because of rectal bleeding, severe stomach cramps, and complications from being stabbed multiple times in 1985. R. at 184-186. The Social Security Administration denied his application initially and on reconsideration, and Mr. Worthen requested a hearing before an administrative law judge ("ALJ").

Mr. Worthen's case was initially assigned to ALJ Richard Palewicz, who held an administrative hearing on June 11, 1997. At that hearing, Mr. Worthen, who was represented by counsel, testified first.

1.   Mr. Worthen's Testimony

Mr. Worthen testified that he is 5'8" and weighs 180

pounds; that he completed the tenth grade, and then attended a law enforcement trade school to become a security guard; that he is single and has two children, though they do not live with him; and that he lives in an apartment with a friend. R. at 598, 600. Mr. Worthen testified that he has no income and receives no public aid, he owns no property, and he has no bank accounts. R. at 599.

With respect to his daily activities, Mr. Worthen testified that he helps with cleaning, dusting, and washing dishes at his apartment, he does his own laundry, but does not cook or do yard or garden work. R. at 609-10. Mr. Worthen testified that he typically walks to the park that is roughly two miles from his house; he testified that, at the park, he likes to sit alone and listen to the radio. R. at 610-11. Mr. Worthen testified that he also watches television for about eight hours a day, he serves as an usher at church and sings in the church choir. R. at 610. Mr. Worthen testified that he reads the newspaper and sports books, but that he is slow to understand much of what he reads. R. at 600.

With respect to his past work experience, Mr. Worthen testified that he worked as a security guard for Wells Fargo Company from 1978 to 1981; he testified that the job involved a lot of walking, standing and bending. R at 601. Mr. Worthen

3

testified that he next worked as a stockman for Kennecott Brothers from 1990 to 1993, where he was required to lift roughly 35 pounds on occasion, and had to walk, stand, and bend. R. at 601. Mr. Worthen testified that, from 1994 to 1995, he worked as a general laborer for Assistance Incorporation, a temp agency; in that job, he had to walk, stand, and bend, and had to lift up to 40-45 pounds. R. at 602. Mr. Worthen testified that he last worked in the winter of 1995. R. at 602.

With regard to his impairments, Mr. Worthen testified that he experiences rectal bleeding about three days a week. He testified that he experiences pain, and typically manages that pain with Tylenol and Zantac; he testified that he also takes amitriptyline for bowel movements, and psylvex for his stomach. R. at 603-04. He testified that, at times – roughly once every month or two, his condition becomes more severe, and he is forced to seek medical attention. R. at 607, 619. Mr. Worthen testified that when his rectum bleeds, he has to sit on the toilet for fifteen minutes or so, until the bleeding stops. R. at 620.

## 2. The Medical Expert's Testimony

After Mr. Worthen, the ALJ heard from Dr. Carl Leigh, a medical expert ("ME") who specializes in internal medicine. R. at 618. Dr. Leigh testified that Mr. Worthen suffers from

4

microangiodysplasia of the colon, which he explained was like having a series of blood blisters inside the colon that can bleed at any time without provocation. R. at 620. Dr. Leigh also testified that there is no good remedy for this impairment, other than surgical removal of that portion of the colon where the lesions occur. R. at 620. Dr. Leigh testified that Mr. Worthen's medical records indicated a history of rectal bleeding over the six month period preceding the hearing, and another episode of recurrent rectal bleeding through 1996; he also noted that the records show that Mr. Worthen had experienced rectal bleeding, on and off, for fifteen years. R. at 622.

In addition to the microangiodysplasia, Dr. Leigh testified that Mr. Worthen suffers from recurring pancreatitis and probable duopeptic ulcer disease, related, in part, to his alcohol consumption. R. at 620-21. Dr. Leigh also testified that Mr. Worthen suffers from chronic alcoholism. R. at 622.

With respect to Mr. Worthen's testimony that he experiences rectal bleeding roughly three times per week, and that, when he does, he needs to use the bathroom frequently and remain there for 15 to 20 minutes, Dr. Leigh testified that this was consistent with microangiodysplasia. R. at 622-23. Dr. Leigh testified that Mr. Worthen's urgency to use the bathroom, and the burning sensation he experienced in his rectum were

5

likely also related to this condition. R. at 623. Dr. Leigh
testified that the pain Mr. Worthen claimed to be experiencing
was likely caused by his peptic ulcer or pancreatitis rather than
his microangiodysplasia. R. at 623.

When asked by the ALJ whether any of Mr. Worthen's
conditions meet or equal a listed impairment, Dr. Leigh testified
that they did not, though he noted that microangiodysplasia is
rather rare. R. at 622. He testified that, in any event, Mr.
Worthen's microangiodysplasia would certainly impact his residual
functional capacity. R. at 622. Dr. Leigh testified that none
of Mr. Worthen's conditions should limit his ability to sit,
stand, walk, lift, or carry. R. at 622-23.

3.    Medical Records

In addition to the live testimony taken at the hearing, the
ALJ had before him various medical records, dating back as far as
1984. The earliest records are largely unreadable, though they
unmistakably contain references to rectal bleeding and epigastric
pain. See, e.g., R. at 238. The records show that, beginning
March 19, 1996, about a month after he filed his application for
social security disability benefits, Mr. Worthen visited the
Miles Square Health Center at the University of Illinois at
Chicago (UIC) to address chronic stomach pain that he claimed to
have been experiencing since 1985, when he had surgery on his

6

abdomen after being stabbed. R. at 293. Mr. Worthen complained that he was experiencing stabbing, unbearable pain usually after meals and sometimes at night; he also reported seeing dark red blood in his stool, and he complained of a chronic cough and stuffy nose. R. at 293-94. Dr. Tai Huynh at UIC diagnosed Mr. Worthen with probable peptic ulcer disease, pain probably caused by chronic pancreatitis, and alcoholism, and he prescribed Zantac for pain. R. at 293. Dr. Huynh ordered some additional tests, and asked Mr. Worthen to return in a couple of weeks. R. at 293. He noted, at the time, that Mr. Worthen reported drinking 24 to 30 beers per day and smoking a pack of cigarettes a day. R. at 293.

The records show that Mr. Worthen saw Dr. Huynh again on May 13, 1996. At that time, Dr. Huynh noted that Mr. Worthen reported that he had cut back his drinking to just a few beers a day, and cut back his smoking to half a pack a day. R. at 289. He also reported that he was feeling "a little better," but that he was still having pain. R. at 289. Dr. Huynh noted that Mr. Worthen had had a colonoscopy, which revealed that Mr. Worthen had microangiodysplasia. R. at 289-90. According to the progress notes, Dr. Huynh ordered some additional tests, told Mr. Worthen to stop smoking, told him to continue taking the zantac, and told him to come back in two months. R. at 289.

7

The records show that Mr. Worthen saw Dr. Huynh again on June 18, 1996; at that time, he reported that he was experiencing epigastric pain and blood in his rectum. R. at 287. Dr. Huynh advised Mr. Worthen that, if he did not stop drinking, his pain might not go away; he diagnosed Mr. Worthen with epigastric pain, most likely caused by peptic ulcer disease, chronic alcoholism, and microangiodysplasia of the colon. R. at 287-88.

The record shows that, on May 15, 1997, Mr. Worthen went to the emergency room at Cook County Hospital, complaining of rectal bleeding; at that time, he reported that he had experienced rectal bleeding intermittently for the past 3-4 years, but that it was now happening on a daily basis. R. at 316. The ER doctor diagnosed Mr. Worthen with angiodysplasia, and instructed him to return immediately to the ER for a colo-rectal evaluation if he experienced bleeding again. R. at 316.

In addition to the medical records from UIC and Cook County Hospital, the record also includes several assessments and evaluations done at the behest of the Social Security Administration. For example, the record includes a historical information report prepared by Dr. Rodney Berger of Chicago Consulting Physicians on February 7, 1996; in that report, Dr. Berger noted that Mr. Worthen's chief complaint was chronic rectal bleeding. R. at 248. According to Dr. Berger, Mr.

Worthen's physical exam was "unremarkable," except for the scar from his 1985 surgery. R. at 248. Dr. Berger noted that Mr. Worthen denied drug and alcohol abuse; he noted that Mr. Worthen was cooperative, his affect, hygiene, grooming and effort were all good. R. at 248. After examining Mr. Worthen, Dr. Berger diagnosed him with gastrointestinal bleeding and elevated blood pressure, and advised him to go to Cook County Hospital to have his problems evaluated. R. at 248.

The record also includes a "Daily Activities Telephone Report" from March 4, 1996. On that day, Mr. Worthen reported that he lives with a friend and shares in household chores, including cooking; he reported that he walks a lot, sleeps well at night, takes public transportation to get around, listens to the radio and watches television. R. at 249. He stated that he does not like to visit people, or to have people visit him, because he has to spend so much time in the bathroom. R. at 250. According to the report, Mr. Worthen stated that he drinks each day, as much as a six pack of beer and a half a bottle of malt liquor, and that he has been drinking on a daily basis since he was 15 years old. R. at 250. He reported that he went through rehabilitation roughly 10 to 15 years ago, but that it did not last long. R. at 250.

The record also includes a report of a psychiatric

evaluation performed on March 25, 1996 by Dr. Beverly Purdy of Chicago Consulting Physicians. R. at 251. In her report, Dr. Purdy stated that she had reviewed all of the reports sent by the Bureau of Disability Determination Services, including the March 4, 1996 Daily Activities Telephone Report, and that she interviewed Mr. Worthen for almost 40 minutes to conduct her evaluation. R. at 251. With regard to his mental status, Dr. Purdy noted that Mr. Worthen made a good effort, but was slow to come up with the date, had difficulty following directions, and had trouble performing basic addition and naming three large cities. R. at 253. She concluded that Mr. Worthen had a "fairly low fund of information," he had difficulty following directions, and he had difficulty with short term memory and concentration. R. at 254. Dr. Purdy noted that Mr. Worthen's hygiene was poor, that his clothes were dirty, and that his fingernails were untrimmed and dirty. R. at 251. She opined that Mr. Worthen would have "some difficulty dealing with people on an interpersonal basis," and she also stated that if granted benefits, Mr. Worthen would not be able to manage his own funds, given his alcohol abuse pattern. R. at 254.

On April 12, 1996, Dr. E. Kuester, a medical consultant for the agency, completed a mental RFC for Mr. Worthen. R. at 256. Dr. Kuester noted that Mr. Worthen was "moderately limited" in

the following categories: the ability to understand and remember detailed instructions, the ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods, the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and the ability to interact appropriately with the general public. R. at 256-57. In the remaining areas of assessment, Dr. Kuester found Mr. Worthen to be "not significantly limited." *Id.* Dr. Kuester elaborated that Mr. Worthen is "somewhat ill at ease socially and demonstrates variable hygiene on exams." R. at 258. Dr. Kuester determined that Mr. Worthen should not have to deal with the public, but that he could perform, and cope with the demands involved with, unskilled work. R. at 258. A notation at the end of Dr. Kuester's assessment indicates that another doctor, Dr. Donald MacLean, reviewed the evidence in the file and affirmed the assessment. R. at 259.

### 4. The ALJ's Decision (or Lack Thereof)

After holding the administrative hearing, but before issuing a decision on Mr. Worthen's claim, ALJ Palewicz died. The case was reassigned to ALJ Carlton Bailey, Jr., who held another hearing on March 18, 1998.

11

B.   Round Two - The Second Administrative
     Hearing & The Resulting Decision

On March 18, 1998, ALJ Bailey held his first hearing in the
case.   Mr. Worthen was present and represented by counsel, and he
again testified, as did a medical expert (though not the same one
who testified at the first hearing), and a vocational expert.   At
the outset of the hearing - the second held so far in the case,
ALJ Bailey acknowledged the earlier hearing before ALJ Palewicz,
and acknowledged that he was required to take into consideration
the evidence received at that hearing; he also acknowledged his
duty to resolve any conflicts between the testimony and opinions
offered by the experts and the doctors in connection with the
first hearing and the testimony and opinions offered by the
experts and doctors in connection with the second hearing.   R. at
628.

     1.   Mr. Worthen's Testimony

Mr. Worthen testified briefly before the medical expert; he
testified to his date of birth, his place of birth, and his
address, and he testified that he had lost a little bit of
weight, roughly ten pounds, in the couple of months leading up to
the hearing.   R. at 631.   The ALJ then heard from the medical
expert, whose testimony is detailed below, and then continued to
question Mr. Worthen.

12

Mr. Worthen testified that he went to school through 11th grade, and that he is able to read and write. R. at 645. He testified that he lives in an apartment with a friend, and that he pays $150 in rent; he testified that he earns rent money by doing "[l]ittle odds and ends," working two or three hours, three or fours days a week, doing things such as picking up cans and emptying garbage around his building, or doing light work in stores like sweeping floors or breaking down boxes. R. at 642–43. He testified that if he falls short on rent money, sometimes "they just let me go. . . ." R. at 644.

Beyond the "odds and ends" jobs, Mr. Worthen testified that he had worked as a security guard, and that he last worked in 1993 for Kennecott, a wholesale flower business. R. at 645-48. He testified that, after Kennecott, he worked briefly for a temp agency, doing different types of jobs, but that he had to stop working there because he kept having to call in sick, and the agency thought he was taking too many days off. R. at 646-47, 663. He testified that he has not looked for work, other than the odd jobs he does in the neighborhood. R. at 660.

When asked about his past history of substance abuse, Mr. Worthen testified that he quit drinking in 1996, R. at 639, and that, although he used drugs in the 1980s, he no longer did so and had not done so for quite some time. R. at 656.

With respect to his impairments, Mr. Worthen testified that he experiences pain in his side from the pancreatitis, as well as gastric pain. He testified that the pancreatitis arose in 1985, after he had surgery to repair some damage done when he was stabbed. R. at 638. He testified that he experiences flare ups of sharp, needle-like pain in his side three or four times a day, and that, when he experiences these pains, he has to sit down or bend over. R. at 651, 663. He also testified that, when he experiences the gastric pain, it takes 15 or 20 minutes for the pain to subside; he testified that he sometimes takes Tylenol, pain pills or aspirin to help with that pain. R. at 651-52. He testified that he has frequent bouts of diarrhea, maybe 25 or 30 days out of each month; he testified that he goes to the bathroom three or four times a day and stays in the bathroom for 15 or 20 minutes each time. R. at 652-53. He testified that he often experiences a sharp pain when he is in the bathroom, when he gets ready to stand up, forcing him to bend over, and he also breaks out into sweats. R. at 651, 653. He testified that he is often unable to control his bowels. R. at 657.

Mr. Worthen also testified that he experiences rectal bleeding three to four days per week, where the blood comes out all at once and he experiences pain like his insides and tissues are going to fall out. R. at 661-62. He testified that, on the

14

days when he is bleeding, he has to go to the bathroom maybe three times a day, and stay there for 15 to 20 minutes. R. at 662. He testified that, after such an episode, he feels tired, in pain, and like he needs to take a Tylenol and lie down for 15 or 20 minutes. R. at 662. He testified that, when he feels a bowel movement coming on, he has to get to a bathroom within two or three minutes or he will lose control. R. at 663.

With respect to his daily activities, Mr. Worthen testified that he generally gets up about 6:00 a.m.; he is able to do some cooking and cleaning, manage his personal hygiene, do a few sit-ups and walk a mile to a mile-and-a-half; he likes to watch television and read the newspaper; and he is able to use public transportation to get around. R. at 649-50, 657. He testified that he is able to sit if he can move around a bit, and he is able to grasp things and reach for things, though sometimes his right hand cramps or freezes up. R. at 657-58. In response to questions from the ALJ, Mr. Worthen testified that he has no problems with memory or concentration, and no suicidal thoughts, but that he does experience sleep difficulties, depression, low energy, and hallucinations that someone is behind him. R. at 659-60.

2.    The Medical Expert's Testimony

In addition to Mr. Worthen, the ALJ heard from Dr. David

15

Abramson, who testified as a medical expert. When asked to assess Mr. Worthen's physical impairments, Dr. Abramson testified that they primarily involve the gastrointestinal tract; he testified that Mr. Worthen suffers from pancreatitis, as a result of his alcohol abuse, he suffers from pain in his epigastrum, which he thought was unexplained, and that he has a peptic ulcer. R. at 633-34. Dr. Abramson also testified that Mr. Worthen experiences rectal bleeding, and that "there appears to be no real explanation for that" either. R. at 634. Dr. Abramson noted that, after a colonoscopic exam, Mr. Worthen was diagnosed with microangiodysplasia, which he assumed could produce bleeding. R. 636. At one point, the ALJ asked Dr. Abramson what microangiodysplasia was, and he testified that he was "not sure"; he testified that "dysplasia" meant that something was "picked up by the colonoscope," r. at 638, and that he assumed a microangiodysplasia could produce bleeding. R. at 636. Dr. Abramson later testified that microangiodysplasia would lead to blood in the stool, but would not lead to diarrhea. R. at 641. He also testified that pain from pancreatitis could be severe, R. at 641, and pointed out for the record that, throughout the hearing that day, Mr. Worthen kept his right hand on his abdomen, causing Dr. Abramson to assume that he was then experiencing pain. R. at 639.

When asked whether any of Mr. Worthen's impairments would affect his ability to work, Dr. Abramson testified that Mr. Worthen's pain might be a factor, and that, if he had "repeated diarrhea or bowel movements," that might be a factor as well. R. at 640. He testified that he saw nothing in the record to suggest that Mr. Worthen would have any cardiovascular limitations, or that his ability to pick up things, to sit, stand or walk would be affected. R. at 640. In response to questions from Mr. Worthen's attorney, Dr. Abramson conceded that pain from pancreatitis can be severe; he also testified that microangiodysplasia would not cause frequent bathroom use. R. at 641.

### 3. The Vocational Expert's Testimony

Finally, the ALJ heard from Dr. Richard Hammersma, a clinical psychologist and vocational expert. When asked to characterize Mr. Worthen's past relevant work, Dr. Hammersma testified that the temp agency job would have been heavy and unskilled, the Kennecott Brothers job would have been medium, unskilled, and the security guard job would have been light and semi-skilled. R. at 665. Dr. Hammersma testified that only the security guard skills would be transferable. Id.

In response to a series of hypotheticals posed by the ALJ, Dr. Hammersma testified that, if Mr. Worthen had the residual

17

functional capacity to perform light work for about four hours a day, and if he had no problems with sitting, standing, or walking, he could perform his past job as a security officer. R. at 665-66. Dr. Hammersma further testified that a need to make 15 to 20 minutes trips to the bathroom may, or may not, affect the ability to do that job, depending on the frequency of the trips. R. at 666. He testified that, for example, if Mr. Worthen had to make three or four trips during the course of the week, there would not be a significant vocational impact. R. at 666. He testified, however, that if the need to take a bathroom break was urgent and immediate, and did not coincide with a scheduled break, those breaks could affect - even significantly - Mr. Worthen's ability to hold down a job. R. at 668-69. Dr. Hammersma also testified that if, in addition to the bathroom breaks, Mr. Worthen had to take additional time so that he could lie down until the pain passed, his ability to hold a job might be affected, again depending on the frequency, duration, and severity of the incidents. R. at 667. Dr. Hammersma conceded that, if he gave full credibility to Mr. Worthen's testimony about his bathroom break needs, Mr. Worthen likely could not perform any of his past work. R. at 667.

When asked about other possible jobs available to Mr. Worthen, Dr. Hammersma testified that Mr. Worthen could perform

18

certain light work jobs, such as cashier, various assembly jobs, and hand packaging jobs, all of which existed in the national economy in significant numbers. R. at 667. He testified, however, that, as with the security officer job, his ability to do these jobs could be affected by his need to take bathroom breaks, depending on the timing, the frequency and the duration of the breaks. R. at 668-69. For example, Dr. Hammersma testified that Mr. Worthen's need for bathroom breaks, assuming the breaks occurred once a day, at random, and required Mr. Worthen to leave his job post for fifteen minutes, might affect his ability to do certain jobs, such as the cashier job, but might not affect his ability to do other jobs, such as the assembly job. R. at 669. The VE testified that if Mr. Worthen required an additional fifteen minute rest break after the bathroom break, he may or may not be able to hold these jobs, depending on the type of job and the individual employer. R. at 670. He testified that, in jobs with a production standard, for example, there are few employers who would tolerate a random half-hour break. R. at 670. Dr. Hammersma testified that some jobs – office cleaner and janitorial jobs, some kitchen helper jobs, for example – could tolerate a single, random thirty-minute break. R. at 670-71. But, Dr. Hammersma testified, if more than one such break was required, even these jobs would be eliminated,

absent an employer accommodation. R. at 671-72.

4. Medical Records

The medical records that were submitted in connection with the hearing before ALJ Palewicz were, of course, before ALJ Bailey as well. In addition, on March 14, 1998, Mr. Worthen's attorney submitted some additional medical records for the file, and ALJ Bailey accepted them and made them part of the record in the case. According to those records, Mr. Worthen continued to see Dr. Huynh at UIC on a semi-regular to sporadic basis. The records show that, after the June 18, 1996 appointment described above, Mr. Worthen next saw Dr. Huynh on September 9, 1996; at that time, Mr. Worthen reported experiencing pain in his right groin, rectal bleeding, "pins-and-needles" tingling in his right leg, and epigastric pain. R. at 320. Dr. Huynh noted that, at this point, Mr. Worthen reported drinking a six pack of beer 3-4 days a week, and smoking about a half a pack of cigarettes each day. R. at 323. Dr. Huynh referred Mr. Worthen to the GI Clinic at UIC, and advised him to reduce his drinking. R. at 323. It does not appear that Mr. Worthen kept his appointment with the GI Clinic.

Mr. Worthen had at least one other appointment at UIC in 1996, though it is not clear that he saw Dr. Huynh at that time. The record shows that he next saw Dr. Huynh again on November 20,

20

1997. At that time, Mr. Worthen complained of epigastric pain, rectal bleeding, and numbness and tingling in his right lower leg. R. at 320. Mr. Worthen reported that he was still drinking occasionally and still smoking about a half a pack of cigarettes a day. R. at 320. Dr. Huynh advised Mr. Worthen that his rectal bleeding was caused by his microangiodysplasia, and that they would continue to monitor his condition and might consider a possible total colectomy if the bleeding became severe and heavy. R. at 320. Dr. Huynh also advised Mr. Worthen that his pain was likely being exacerbated by his drinking and smoking, and he urged Mr. Worthen to stop doing both. R. at 320. He told Mr. Worthen to continue taking zantac, and asked him to return to UIC in one month. R. at 320. From the lack of records, it appears that Mr. Worthen failed to return to the clinic as instructed. But, on February 26, 1998, he called UIC complaining of stomach problems and blood in his stool, and made an appointment to see Dr. Huynh again on March 3, 1998. See R. at 319. It is not clear that he kept that appointment.

5.  ALJ Bailey's First Decision

On June 19, 1998, ALJ Bailey issued his first decision, finding that Mr. Worthen was not disabled and denying his claim for benefits. R. at 93. The ALJ first determined that Mr. Worthen had not performed substantial gainful activity after the

21

alleged onset date of January 23, 1995. R. at 96. He then determined that Mr. Worthen had functional limitations associated with pancreatitis and substance abuse that were "severe" within the meaning of the Social Security Act. R. at 96-7. The ALJ noted that the records from the treating physician indicated that Mr. Worthen was diagnosed with rectal bleeding secondary to angiodysplasia, chronic alcoholism, and chronic epigastric pain, secondary to chronic pancreatitis. R. at 95. He further noted that a psychiatric evaluation reported Mr. Worthen to have alcohol abuse/dependence issues and mild difficulty with short term memory and concentration. R. at 96. The ALJ noted that none of Mr. Worthen's impairments met or equaled a listed impairment. R. at 97.

With respect to his ability to work, the ALJ first considered Mr. Worthen's subjective complaints, and found them to be unsupported in the objective medical evidence; the ALJ found Mr. Worthen to be less than credible. R. at 100, 101. In particular on this score, the ALJ noted that Mr. Worthen claimed to be unable to control his bowels, claimed that he had an urgent and immediate need to use the restroom three or four times per day, and claimed that each bathroom trip lasted 15 or 20 minutes. R. at 99. Yet, the ALJ noted, Mr. Worthen was in the hearing room on time, and he never asked for a recess to use the

22

bathroom, suggesting that, at least on that one occasion, he could control the frequency and duration of his bathroom trips during the course of the hearing. R. at 99. The ALJ further noted that Mr. Worthen claimed that he had needed to lie down ten minutes before the hearing started because his stomach was bothering him so badly. R. at 99. Yet, the ALJ stated that he saw Mr. Worthen at least five minutes before the hearing, and he was not lying down. R. at 99.

In the end, the ALJ determined that Mr. Worthen retained the functional capacity for light work. R. at 97. In particular, the ALJ determined that Mr. Worthen could perform jobs that would require him to lift no more than 20 pounds frequently and 50 pounds occasionally, that would not require him to sit for more than two straight hours without the opportunity to alternate positions, and that would not require him to stand or walk for more than one hour without interruption and up to a total of four hours. R. at 97. The ALJ further determined that Mr. Worthen should avoid extremes in temperature, avoid jobs that require repetitive reaching overhead with his left arm or prolonged holding of objects with his left arm. R. at 97-98. Based upon Dr. Hammersma's testimony at the hearing, the ALJ determined that Mr. Worthen retained the residual functional capacity to perform his past relevant work as a security officer. R. at 100, 102.

The ALJ made no findings with respect to Mr. Worthen's ability to perform other jobs in the national economy.

5.   The Appeals Council's First Remand

Mr. Worthen requested a review of ALJ Bailey's June 19, 1998 decision, and, on February 9, 2000, the Appeals Council granted that request and remanded the case to the ALJ. R. at 115.  In so doing, the Appeals Council noted that the ME from the first hearing had testified that Mr. Worthen's microangiodysplasia "would certainly have an impact" on his RFC, yet the ALJ disregarded this testimony and accepted the testimony from the ME from the second hearing, who admitted that he was unfamiliar with the condition.  R. at 115.  Thus, on remand, the Appeals Council instructed the ALJ to "[o]btain additional evidence concerning [Mr. Worthen's] physical and mental impairments in order to complete the record in accordance with regulatory standards concerning consultative examinations and existing medical evidence . . . ," to further evaluate Mr. Worthen's subjective complaints and mental impairments, and to give further consideration to (and provide appropriate rationale for) Mr. Worthen's maximum residual functional capacity.  R. at 115-16. The Appeals Council further instructed the ALJ to obtain, if necessary, additional evidence from a medical expert and a vocational expert concerning the nature and severity of Mr.

24

Worthen's impairments, as well as the effects, if any, they might have on his occupational base. R. at 117. Finally, the Appeals Council instructed the ALJ to "[c]onduct any necessary further proceedings to determine whether drug addiction and alcoholism are contributing factors material to a finding of disability." R. at 117.

C.  Round Three - The Third Administrative
    Hearing & The Resulting Decision

On remand, ALJ Bailey schedule another hearing - the third so far, which was held on March 7, 2002. At the outset of the hearing, the ALJ asked Mr. Worthen and his attorney to address some confusion concerning the true onset date of his alleged disability; the ALJ noted that Mr. Worthen had been claiming an onset date of January 23, 1995, but that he had contended in a signed Disability Report that his condition first started bothering him on May 22, 1995. See R. at 465-67, 196. After discussing the matter, the ALJ, Mr. Worthen and his attorney agreed that his true alleged onset date should be changed to May 22, 1995 to reflect the fact that he had actually worked for the first several months of 1995. R. at 467. With this clarification, Mr. Worthen testified yet again, as did yet another VE and another ME.

1. Mr. Worthen's Testimony

Mr. Worthen, who was 49 at the time of this hearing, testified that he went to school through the 8th grade, and that he lives alone in an apartment and pays $375 in rent – presumably monthly, though that is not established in the record. R. at 490, 492. Mr. Worthen testified that he pays his rent by doing "little odds and ends around the building," such as painting, making sure doors are shut, helping people move in or out, etc. R. at 490-91. Mr. Worthen testified that he receives $180/month in food stamps, and that, for 26 weeks in 2000, he also received unemployment benefits. R. at 490-91.

With respect to daily activities, Mr. Worthen testified that he wakes up early, watches some television, and then gets dressed and heads out. R. at 497. He testified that he takes out his own garbage, does the majority of the cooking, does his own dishes, and manages his own personal hygiene; he attends church and is able to get around on public transportation. R. at 497-98.

With respect to his past work, Mr. Worthen testified that he was employed as a general laborer by a temporary agency, but that he quit in 1995 due to his stomach problems. R. at 493. He testified that, before that, he was a stockman from 1990 to 1993 and a security guard until 1981. R. at 494.

With respect to his impairments, Mr. Worthen testified that he has a hernia in the middle of his stomach, which causes pain. R. at 472. He testified that he is able to relieve his pain, at times, by standing, though he testified that if he stands for more than 15 or 20 minutes, his legs get weak and he has to sit down again. R. at 472. Mr. Worthen testified that he sleeps "so-so" and gets up twice in the middle of the night to go to the bathroom. R. at 474. He testified that he has to move his bowels about every half hour to hour, every day. R. at 473-74. He also testified that he takes laxatives, on instruction from his doctor, to keep his system clean, and that his doctor knows how often he moves his bowels. R. at 475, 489. He testified that his stools are normal, but with a tinge of blood and a very foul odor. R. at 474-75. Mr. Worthen testified that sometimes his stool turns green, which means his bowels are backing up again, which might require additional surgery. R. at 489. He testified that he has pain and cramps when he has to use the bathroom for bowel movements, and that sometimes he has control over his movements, while at other times he does not. R. at 504-05. He then testified that, once he starts to feel that he has to use the bathroom, he cannot wait, and must go to the bathroom immediately. R. at 505. He testified that he typically spends 15 or 20 minutes in the bathroom with each bowel movement, and

27

that he typically has one or two a day, once in the morning and once late at night. R. at 504-05. He testified that he has severe pain, two or three times a day, lasting for 10 or 15 minutes each time, and he experiences rectal bleeding three or four days a week. R. at 504, 505.

With respect to alcohol and drug use, Mr. Worthen testified that he started drinking at age 11 and drank on and off since he was stabbed four times in 1985. R. at 499. Mr. Worthen testified that he has not had a drink since March 2000, when he went through a program to help him stop; he testified that he does not have a problem with drugs. R. at 471-72. Mr. Worthen testified that he reads books put out by Alcoholics Anonymous, has a sponsor, and attends AA meetings. R. at 500. He also testified that the pain is worse since he stopped drinking, and that he goes to the bathroom more as well, although he admitted this might be partly explained by his laxative use. R. at 500-01.

2.   The Medical Expert's Testimony

The ALJ also heard from Dr. Ernest Mond, who testified as a medical expert. When asked about Mr. Worthen's impairments, Dr. Mond testified that Mr. Worthen has angiodysplasia of his rectum and colon, which he described as a vascular malformation of small blood vessels that may (or may not) cause recurrent bright red

28

bleeding from the colon. R. at 476. Dr. Mond testified that, in Mr. Worthen's case, the condition is more of a nuisance than a severe problem; the bleeding is not severe enough to give him anemia or to require active intervention. R. at 476-77, 484. Dr. Mond testified that, in addition to the angiodysplasia, Mr. Worthen had surgery in 1985 after being stabbed, and he has chronic, intermittently, alcohol-induced, acute pancreatitis. R. at 477. Dr. Mond testified that Mr. Worthen has had chronic abdominal pain since 1985, and he noted that Mr. Worthen's alcohol use had probably also caused gastritis and peptic ulcer disease. R. at 478. Dr. Mond testified that Mr. Worthen also has a ventral hernia, but noted that this was not of great significance. R. at 479.

Dr. Mond testified that Mr. Worthen's impairments, whether taken together or alone, would not meet or equal a listed impairment. R. at 479. When asked how his impairments might limit Mr. Worthen's ability to work, Dr. Mond testified, essentially, that there would be no limitations; he testified that Mr. Worthen would be able to sit, stand, walk, lift, carry, push, pull, grasp, reach, and use his feet without limitation. R. at 480-81. He testified that Mr. Worthen could bend, squat, crawl and climb occasionally, and that he should have no limitations in terms of his exposure to temperature and humidity,

dust and fumes, or in terms of his ability to drive; he testified, however, that Mr. Worthen should avoid unprotected heights and avoid being around heavy machinery. R. at 481.

On questioning from Mr. Worthen's attorney, Dr. Mond testified that Mr. Worthen's gastritis could cause severe pain, as could his peptic ulcer disease and his pancreatitis; he testified, however, that all of these conditions are severely influenced by alcohol intake. R. at 483. Dr. Mond testified that all of Mr. Worthen's impairments, except for his chronic pancreatitis, would likely go away if he stopped drinking. R. at 484. Dr. Mond conceded that, when it occurs, Mr. Worthen's pain could be distracting. R. at 484. He also conceded that Mr. Worthen's angiodysplasia and his pancreatitis could also require him to spend extra time in the bathroom, the former when he is bleeding and the latter because it causes frequent bowel movements and a sometimes urgent need to use the bathroom. R. at 484, 486, 488. On this last issue, Dr. Mond noted that Mr. Worthen claimed to be taking laxatives on his doctor's orders, a course of treatment Dr. Mond questioned, given that one of the problems of chronic pancreatitis is loose stools. R. at 479, 486.

### 3. The Vocational Expert's Testimony

In addition to Mr. Worthen and the ME, the ALJ also heard

from Grace Gianforte, a licensed certified counselor in private practice, who testified as a vocational expert ("VE"). VE Gianforte asked Mr. Worthen a number of questions concerning his past work experience, and then testified that those jobs would be classified as follows: the security guard job would have been light in exertion and semi-skilled; the stockman/flower assembler/arranger would have been medium in exertion and unskilled; the punch press operator would have been medium in exertion and semi-skilled; and the other jobs he did for the temp agencies would have been medium in exertion and unskilled. R. at 507-10. The ALJ then asked VE Gianforte to respond to a series of hypotheticals. First, he asked her whether a person could do Mr. Worthen's past relevant work if he could sit, stand and walk for six out of eight hours, lift 50 pounds occasionally and 35 pounds frequently, bend, squat, crawl and climb only occasionally, and be required to avoid unprotected heights and moving machinery; she testified that the stockman/flower arranger job may be consistent with this hypothetical, as would the security guard job. R. at 510-12. She also testified that a person with this RFC could work as a lobby attendant or a salad maker in a hotel or hospital. R. at 513. Overall, she testified, a person with an RFC that allowed only occasional bending would be very restricted at the medium level of work, and

substantially restricted at the light level of work, especially given the limited education. R. at 511-12.

With regard to the need for bathroom breaks, VE Gianforte testified that, having to use the restroom a couple of times a day beyond rest periods or breaks would not be viewed as excessive. R. at 513. She testified, however, that if Mr. Worthen had to stay in the bathroom for 15 or 20 minutes a couple of times a day beyond scheduled breaks, that *would* be considered excessive. R. at 513. She testified that, even if one such break was required, it could have an impact on his ability to do the job; she said the question of whether such a person could work, would depend on the employer and the nature of the establishment, and on whether it was the kind of place where other employees would be available to pick up the slack during those breaks. R. at 513-14. For example, if there are several salad makers or several lobby attendants on the job at the same time, Mr. Worthen's going off to the bathroom for a while might not be a problem. R. at 514.

4. Medical Records

The medical records admitted at the previous two hearings were already before the ALJ this time around. In addition, on February 1, 2002, Mr. Worthen's attorney submitted some additional medical records, which the ALJ accepted as part of the

32

record in the case.  According to the supplemental records, from February 1999 to January 2002, Mr. Worthen was treated at Cook County Hospital; progress notes from that time period contain numerous references to rectal bleeding, bleeding ulcers, pancreatitis, and severe rectal and abdominal pain.  *See* R. at 388-402.  Of particular significance, the record shows that, on March 10, 1999 and March 15, 1999 respectively, Mr. Worthen underwent a sigmoidoscopy for evaluation of constipation, and an esophagogastroduodenoscopy for evaluation of abdominal pain.  R. at 384-85.  The former revealed no abnormalities (no hemorrhoids, polyps, masses, mucosal abnormalities, vascular malformations or diverticular disease); the latter revealed a hiatal hernia, mucosal abnormalities in his entire stomach, and a duodenal ulcer.  R. at 384-85.

The record also shows that Mr. Worthen went to the emergency room at Bethany Hospital on October 11, 2000, complaining of abdominal pain; he was admitted with a small bowel obstruction. R. at 331.  The record shows that he had surgery the next day, and again on October 25, 2000, after another obstruction developed; he was released from the hospital on November 1, 2000. R. at 331.  Progress notes on November 30, 2000 show that Mr. Worthen had reported abstinence from alcohol since his October surgery.  R. at 397.  A follow-up appointment at Cook County

33

Hospital on December 14, 2000 indicates that Mr. Worthen was suffering from mild anemia. R. at 396.

The record shows that Mr. Worthen continued intermittent visits to Cook County Hospital in 2001 and into 2002. On February 1, 2001 Mr. Worthen returned to Cook County Hospital complaining of two months of abdominal swelling and dizziness when he stood up. R. at 394. He denied alcohol use and stated that he had not followed up with the GI or pain clinics, as his doctor had suggested; he also admitted that he had missed a number of visits between November 2000 and February 2001. R. at 394. Dr. Varkey, Mr. Worthen's treating physician, noted that Mr. Worthen's abdomen was bloated and diffusely tender, and that he was suffering from a ventral hernia, which she thought could be reduced with surgery; Dr. Varkey, therefore, again referred Mr. Worthen to the GI and pain clinics. R. at 394. Progress notes from June 5, 2001 show that, on that date, Mr. Worthen complained of bright red rectal bleeding. R. at 391.

The record also contains a February 21, 2002 letter from Dr. Varkey, indicating that Mr. Worthen has suffered from longstanding abdominal pain and a large ventral hernia, and noting that surgery for the hernia had been scheduled. R. at 383. As of the time of the hearing, the surgery had not yet been done.

5. ALJ Bailey's Second Decision

On April 24, 2002 ALJ Bailey issued his second unfavorable decision. R. at 29. He first determined that, although Mr. Worthen had engaged in *some* work activity, he had not performed *substantial gainful activity* during the period of alleged disability. R. at 30. The ALJ further determined that, although Mr. Worthen's impairments cause significant limitations in his work related functioning and are therefore "severe" within the meaning of the Regulations, they are not "severe" enough to meet or medically equal one of the listed impairments. R. at 30. Specifically, the ALJ determined that the medical evidence established that Mr. Worthen suffers from angiodysplasia of the rectum and sigmoid, chronic pancreatitis, and chronic abdominal pain, which was apparently alcohol and drug related. R. at 30. The ALJ agreed with ME Mond that Mr. Worthen's gastritis and peptic ulcer would reasonably be expected to improve if he stopped drinking, but he determined that the chronic pancreatitis would not improve and would continue to cause some difficult-to-measure pain. R. at 30.

The ALJ found Mr. Worthen's testimony regarding pain to be only partially credible. R. at 31. He concluded that Mr. Worthen's subjective allegations were only somewhat consistent with the evidence of record. R. at 31. For example, the ALJ

35

noted that, although he complained of pain at the hearing, the records show that Mr. Worthen had never been to a pain clinic. R. at 31. The ALJ also determined that, although Mr. Worthen testified that he had not consumed alcohol since March of 2000, based on the nature and kind of stomach pain Mr. Worthen described, some of the stomach pain must have been caused by drinking, because "no other rational explanation exists in the file." R. at 31.

With regard to his ability to work, the ALJ determined that Mr. Worthen retained the residual functional capacity to perform medium work, and that he possessed the vocational and physical requirements needed to return to his prior work as a flower arranger. R. at 33. The ALJ concluded that Mr. Worthen could also make a vocational adjustment to other work in the regional or national economy, and perform jobs such as a lobby attendant and salad maker. R. at 33. The ALJ adopted the VE's testimony to the effect that, if Mr. Worthen really needed breaks for 15 to 20 minutes, he would not be able to work. R. at 32. But he determined that the record did not support the notion that Mr. Worthen needed such breaks. R. at 32.

6.  The Appeals Council's Second Remand

Mr. Worthen requested review of this decision as well, and the Appeals Council, once again, remanded the case to ALJ Bailey

with instructions. R. at 155. This time around, the Appeals Council instructed the ALJ to obtain updated evidence from Mr. Worthen's treating sources, give consideration to the new medical evidence, the treating source opinion, examining source opinion, and non-examining source opinion, and explain the weight given to such opinion evidence; it also directed him to evaluate Mr. Worthen's subjective complaints and explain his findings. R. at 156. The Appeals Council noted that, in finding Mr. Worthen to be only partially credible, the ALJ failed to consider all of the areas required by Social Security Ruling (SSR) 96-7p, which sets forth specific factors to be addressed in assessing an individual's credibility, and it directed him to apply the regulation on remand. R. at 155-56.

The Appeals Council also directed the ALJ to consider whether drug addiction and/or alcoholism were contributing factors material to a finding of disability. R. at 157. And it directed the ALJ to obtain supplemental evidence from a medical expert or a psychiatrist to clarify the nature and severity of Mr. Worthen's impairments in accordance with 20 CFR 404.1527(f) and SSR 96-6p. R. at 157. Finally, the Appeals Council directed the ALJ to give further consideration to Mr. Worthen's maximum RFC and to provide appropriate rationale with specific references to evidence of record in support of the assessed limitations in

37

accordance with 20 CFR 404.1545, SSR 85-16, and SSR 96-8p.  R. at
157.

D.   Round Four - The Fourth Administrative
     Hearing & The Resulting Decision

On remand, ALJ Bailey scheduled yet another administrative
hearing.  Thus, on May 20, 2003, Mr. Worthen testified at his
fourth administrative hearing, the third in front of ALJ Bailey.
At the outset, the ALJ again pointed out some inconsistencies
with Mr. Worthen's alleged onset date, and the alleged onset date
was again amended, this time to October 11, 2000, to account for
the fact that Mr. Worthen had performed substantial gainful
activity in 1999 and 2000.  R. at 521, 529-30.

     1.   Mr. Worthen's Testimony

Mr. Worthen, who was by this time 50 years old, testified
first that, since the last hearing date, he had been rendered
homeless.  R. at 523.  He testified that he had been engaged, but
that his fiancée died.  R. at 531, 539.  He testified that he
then lost his apartment and had been living in various homeless
shelters for the past year.  R. at 523, 551.  He testified that
he receives food stamps and is no longer able to perform "odd
jobs" because of illness.  R. at 524.

He testified that in 1999 he worked various labor jobs
through a temporary agency; he worked as a machine operator and

he worked sweeping, mopping, and buffing floors. R. at 525. Mr. Worthen further testified that in 2000 he worked until his hospitalization in October. R. at 525, 530. He testified that, after he was released from the hospital, he could not work because he had stitches in place. R. at 526. He testified that he did make some attempts to go back to work, but that the agency was reluctant to send him on jobs for fear of him getting sick. R. at 526.

With respect to his daily activities, Mr. Worthen testified that, after the October 2000 surgery, he would do household chores such as cooking and washing the dishes, and he attended church. R. at 531-32. He testified that, since he lost his apartment and started staying in shelters, he has to be out by 5 a.m., so he walks to a park, where he sits with a blanket. R. at 536-37. He testified that he collects cans in a cart and sells them for money. R. at 542. He also testified that, at churches, he would empty garbage, clean the yard, and wash windows and dishes in exchange for food and shelter. R. at 552.

With respect to his physical impairments, Mr. Worthen testified that he has had rectal bleeding since he was about 17 years old, and that he had half of his pancreas surgically removed in 1985. R. at 532. He testified that he has a stomach hernia, which causes an aching pain if he sits or walks for too

39

long, and which is affected when he eats. R. at 532-533. He testified that he takes aspirin for pain, but that nothing really seems to help. R. at 534. He testified that he still has rectal bleeding every three to four days, and that he remains in the bathroom for up to a half an hour each time he goes in there. R. at 543. Mr. Worthen testified that his legs hurt if he walks too long. R. at 533. He testified that his weight has fluctuated since he started living in shelters; he testified that his lowest weight was 140 pounds, that he now weighs around 160, and that his "normal weight" is 180 pounds. R. a 535-36.

With respect to mental impairments, Mr. Worthen testified that he was hospitalized in April 2003 for depression and possible suicide attempts after losing his apartment and his fiancée. R. at 539, 540. He testified that he felt like giving up. R. at 540.

With respect to pain, Mr. Worthen testified that, because of his pancreatitis, he has sharp pains, which force him to bend over into a fetal position. R. at 543. He testified that this occurs three to four times per day and that, each time, he has to stay that way for 10 to 15 minutes. R. at 543. He testified that he has cramping pain from strained muscles after using the bathroom, and that he has to lie in the grass or on a bench for relief. R. at 544. He testified that he has seen a psychologist

and that he takes Trazadone for depression.   R. at 541.

With respect to drug and alcohol use, Mr. Worthen testified that he began using drugs at age twelve or thirteen, used speed and heroin, and guessed that he has not used drugs in three to four years.   R. at 537-38.   He testified that he started drinking at age nine or ten, and that he had a recent relapse of drinking for a couple of days two months ago because of depression.   R. at 539.   He testified that he had another relapse in 2002.   R. at 553.   He testified that he also tested positive for amphetamine use at the time of the 2002 relapse and was referred to a drug treatment outpatient facility.   R. at 553.   He testified that he thought the positive test had been caused by a mixture of prescribed medication he was taking, and that he did not know why his doctors would refer him to drug treatment if that was the explanation.   R. at 553-54.

2.    The Medical Experts' Testimony

At the fourth administrative hearing, the ALJ heard from two medical experts, one focusing on physical impairments and one focusing on mental impairments.   First to testify was Dr. Bernard Stevens, who is board certified in internal medicine.   R. at 547.   Dr. Stevens testified that Mr. Worthen's impairments include a ventral hernia from repeated surgeries, as well as problems with abdominal pain, recurrent gastritis and ulcers.   R. at 548.

41

With respect to Mr. Worthen's physical RFC, Dr. Stevens testified that Mr. Worthen could sit, stand, and walk six hours out of an eight-hour day, that he could do medium work, and that he could lift 25 pounds frequently and 50 pounds occasionally, but that, because of the hernia, he would be restricted in postural activities such as kneeling, stooping, crouching, crawling, and anything else that involves flexing and straightening his abdomen. R. at 571-72.

Dr. Stevens testified that, Mr. Worthen's complaints to the contrary notwithstanding, neither chronic diarrhea, bladder problems nor severe gastrointestinal tract impairments are supported by the record. R. at 573-74. Dr. Stevens added that there was no record of severe abdominal pain, and that any pain Mr. Worthen might have would not interfere with work. R. at 573.

Dr. Stevens testified that the record contains no evidence that Mr. Worthen still suffered from microangiodysplasia. R. at 574. He testified that this condition can lead to unpredictable bleeding, and it can be cured by surgically removing the lesion, or by burning it; he testified that if it's not removed, nothing really happens, other than the bleeding. R. at 575-76. He testified that, although the record indicated that Mr. Worthen suffered some bleeding, indicated by "BRBPR" in the record (which Dr. Stevens testified to meaning "bright red blood per rectum),

42

it was not severe; if it had been severe, he testified, there would be some record of anemia or at least a hospital stay, neither of which were reflected. R. at 574-75. Dr. Stevens also noted that, in his view, the record contained no evidence that Mr. Worthen's pancreatitis was still an active concern. R. at 576. Dr. Stevens testified that the gastritis appeared to still be an issue, but that it could be related to alcohol use. R. at 576.

When questioned about the subjectivity of pain, Dr. Stevens opined that gastritis could cause pain, but that it would not cause pain so severe that it would prevent someone from working and affect one's ability to concentrate. R. at 577. He noted that pain from pancreatitis could cause such pain, but there was no evidence in the record that Mr. Worthen experienced frequent or recurrent episodes. R. at 577. Dr. Stevens testified that Mr. Worthen's weight loss could be explained by his not getting enough food, but that there is no biochemical evidence that he is malnourished. R. at 577-78. Finally, Dr. Stevens noted that Mr. Worthen had undergone a decompression in October 2000, where the doctors had cut out scar tissue from previous surgeries that was causing bowel obstruction. R. at 578.

Also testifying as a medical expert at the fourth hearing was Dr. Marva Dawkins, a licensed clinical psychologist. R. at

548. Dr. Dawkins testified that Mr. Worthen had been diagnosed with a depressive disorder, alcohol dependence and amphetamine dependence. R. at 555. Regarding Mr. Worthen's mental residual functional capacity ("MRFC"), Dr. Dawkins opined that Mr. Worthen was "Not Significantly Limited" ("NSL") in eighteen out of twenty categories, but that his psychologically-based symptoms left him moderately limited in his ability to complete a normal workday and workweek without interruption and to perform at a consistent pace without an unreasonable number and length of rest periods. R. at 563. Dr. Dawkins opined that Mr. Worthen was also "moderately limited" in his ability to set realistic goals and make plans independent of others. R. at 564. In Dr. Dawkins' opinion, an MRFC assessment completed by examining psychiatrist Dr. Langner, which found Mr. Worthen moderately limited in all 20 categories, was not supported by the medical evidence. R. at 559-60. Dr. Dawkins opined that, instead of relying on Dr. Langner's MRFC assessment, she would rely on the more recent medical records from when Mr. Worthen was hospitalized for depression. R. at 561.

With respect to Mr. Worthen's mental impairments, Dr. Dawkins noted that, in the past year, the record shows only one documented bout of depression that interfered with his ability to function and that required medical intervention; she conceded,

44

however, that Mr. Worthen certainly could have been somewhat depressed on other occasions as well, without requiring hospitalization or medical documentation. R. at 567.

### 3. The Vocational Expert's Testimony

Finally, the ALJ heard from Glee Ann Kehr, a certified vocational rehabilitation consultant, who testified as a vocational expert. R. at 580. She testified that, as of July 30, 2002, when Mr. Worthen turned 50, he stopped being classified as a "younger individual" and was now classified as "closely approaching advanced age." R. at 580. She testified that Mr. Worthen's past relevant work as a stocker would be classified as medium in physical demand and unskilled in nature; his packer jobs would have been both light and medium in physical demand and unskilled in nature; his security guard job would have been light and semiskilled, though transferable down to sedentary; the machine operator job would be medium and unskilled; the janitorial position would be light and unskilled; and the flower shop position would be light and unskilled. R. at 585.

The ALJ asked Ms. Kehr to respond to various RFC hypotheticals. First, the ALJ asked Ms. Kehr to consider a person who could stand, sit, and walk six hours out of an eight hour day, frequently lift 25 pounds and occasionally lift 50, but only occasionally bend, squat, crawl, and climb, who was

45

moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and moderately limited in ability to set realistic goals and make plans independent of others. R. at 585. Ms. Kehr testified that such a person could perform all of the jobs Mr. Worthen had held, except the stocker position, which would be precluded because it involved frequent bending and squatting. R. at 586. She also noted that, although the security guard job would fit within the ALJ's RFC, Mr. Worthen would be precluded from doing that job because he does not have a license to do such work. R. at 587.

With regard to the non-exertional limitations, Ms. Kehr testified that, although they might slow Mr. Worthen down, with only those limitations in pace, he could still be on task 85 to 90 percent of the day, which would be acceptable to most employers. R. at 588-89. She testified, however, that if Mr. Worthen required two unscheduled bathroom breaks, lasting 20 minutes each, all of the jobs would be precluded. R. at 589. She testified that he might be able to do the janitorial and flower shop positions, which typically allow a morning break, a lunch break and an afternoon break, if he took his bathroom breaks as his regular, non-lunch breaks. R. at 590. She

46

testified that if Mr. Worthen needed two unscheduled 30-minute breaks any more than once every few weeks, all jobs would be precluded. R. at 591. Finally, Ms. Kehr testified that, if a person was moderately limited in every category on the Mental Residual Functional Capacity Assessment Form - as Dr. Langner indicated Mr. Worthen was, see R. at 412-13 - that person would be unable to sustain work. R. at 592.

4.    Medical Records

In addition to the array of records already admitted, in connection with the May 20, 2003 hearing, Mr. Worthen's attorney submitted progress notes from Dr. Varkey, Mr. Worthen's treating physician at Cook County Hospital. According to those notes, by September 30, 2002, Mr. Worthen still had not had his hernia surgery. R. at 407. On that day, Mr. Worthen reported that he had relapsed with his alcohol abuse in May and June 2002. R. at 407. The record from that visit shows that Dr. Varkey noted his ventral hernia, chronic abdominal pain, the alcohol abuse relapse, and his tension headaches; she advised him to take Tylenol for his abdominal pain and ibuprofen for the headaches, to attend AA meetings for his alcohol abuse, and to cut down on cigarettes and caffeine to alleviate heart palpitations. R. at 407.

The record also includes the aforementioned March 5, 2003

47

Mental Residual Functional Capacity Assessment Form completed by Dr. Langner, who examined Mr. Worthen at the request of the agency. R. at 408-415. According to Dr. Langner, Mr. Worthen arrived on time, his dress, grooming, and attitude were appropriate, and he was cooperative. R. at 408. Mr. Worthen stated that he was homeless and living in a shelter. R. at 409. Dr. Langner noted that Mr. Worthen's affect was somewhat flat, that he was able to state the correct date, the address of the examination center, and his own age and birthday, that he had trouble with immediate memory, where he was able to remember four digits forward but none backward, and he recalled only one of three objects told to him when tested after a few minutes. R. at 409. Regarding long-term memory, Dr. Langner noted that Mr. Worthen named the current and former Presidents of the United States as "Bush" and "Carter." R. at 410. In terms of intellectual functioning, Mr. Worthen could not name five large cities (he responded New York, Chicago, and Minneapolis), said there were 365 weeks in a year, could perform simple arithmetic, and was unable to subtract serial sevens. R. at 410. Dr. Langner diagnosed Mr. Worthen with dysthymic disorder, and he assigned him a score of 50 on the Global Assessment of Functioning Scale. R. at 41-11. On the mental residual functional capacity assessment form, Dr. Langner found Mr.

Worthen "moderately limited" in all 20 categories, though he did not elaborate on these findings in the narrative sections on the form. R. at 412-415.

The record also shows that, on March 27, 2003, Mr. Worthen was admitted into the Department of Health and Human Services because of depression and suicidal ideation. R. at 426, 447. Mr. Worthen admitted that he had had an alcohol relapse three weeks prior. R. at 427. In the intake evaluation, Mr. Worthen stated that he "just wanted a nice apartment" and that he was "tired of waiting for my disability." R. at 426. He also stated that he was depressed over homelessness, drug use, being unemployed, and a hernia that prevents him from working. R. at 426. He was diagnosed with depressive disorder, alcohol dependence, amphetamine dependence, and a ventral hernia with mild tenderness all over. R. at 440. He was released on April 11, 2003, and he stated he had a positive outlook on daily plans and future treatment. R. at 453. Nevertheless, by a follow up appointment on April 25, 2003 at an outpatient psychiatric evaluation, Mr. Worthen was again complaining of depression due to homelessness and lack of income, as well as panic attacks, feelings of hurting others, intermittent crying spells, decreased sleep, and sparse feelings of hopelessness and helplessness. R. at 421. He was given Zoloft and Trazadone, and stated that the

49

medication helped his symptoms.  R. at 421.

5.  The ALJ's Third Decision

On January 29, 2004, ALJ Bailey issued his third and final unfavorable decision, finding Mr. Worthen not disabled within the meaning of the Social Security Act.  R. at 17.  The ALJ determined that Mr. Worthen had not performed substantial gainful work since the amended onset date of disability, October 11, 2000, that Mr. Worthen suffered from impairments that were "'severe' within the meaning of the Regulations but not 'severe' enough to meet or medically equal [a listed impairment]."  R. at 18.  On this score, the ALJ determined that Mr. Worthen had a "history of hypertension, abdominal stab wounds and pancreatic surgery in 1985, right inguinal herniorrhaphy in 1990, gastrointestinal bleeding, rectal bleeding due to microangio dysplasia and peptic ulcer disease," and that "the medical evidence indicates that [he] has depression, ventral hernia and substance abuse. . . ."  R. at 18.  The ALJ adopted the opinion of Dr. Marva Dawkins, the medical expert who testified at the last hearing, that Mr. Worthen "has a slight restriction of activities of daily living, slight difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace."  R. at 19.

Turning to Mr. Worthen's residual functional capacity, the

ALJ first noted that, in assessing Mr. Worthen's ability to work, he was obliged to consider "all symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence . . . ." R. at 20. The ALJ also noted that, because Mr. Worthen's complaints regarding his functional limitations were subjective, he was required to assess Mr. Worthen's credibility. R. at 20. On this score, the ALJ determined that Mr. Worthen's allegations were "partially credible in light of the medical record." R. at 20. He noted that Mr. Worthen was "largely candid about his alcohol abuse," and that he had admitted to having two relapses in his drinking. R. at 20.

Ultimately, the ALJ concluded that Mr. Worthen had the ability to return to some of his past relevant work. The ALJ stated that he had "great sympathy for [Mr. Worthen's] condition; indeed, he stated "[a]s much as I would like to approve his application, (and I tried), I cannot." R. at 20. The ALJ concurred with the opinions of the medical experts who testified at the last hearing; in particular, he concurred with the opinion of Dr. Bernard Stevens that Mr. Worthen retains the physical residual functional capacity for lifting and/or carrying, pushing and/or pulling 50 pounds occasionally and 25 pounds frequently, sitting and standing and/or walking 6 hours total in an 8-hour

51

workday, and occasional balancing, stooping, crouching, kneeling, crawling or bending, and he concurred with the opinion of Dr. Dawkins that Mr. Worthen had "the mental residual functional capacity for moderately limited ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods and moderately limited ability to set realistic goals or make plans independently of others." R. at 20. The ALJ determined that Mr. Worthen's "main physical condition at this time is a ventral hernia," and he adopted Dr. Stevens' opinion that Mr. Worthen's allegations of chronic bathroom use "were not supported"; he also determined that Mr. Worthen's rectal bleeding did not cause pain, that his pancreatitis was no longer active, and that his gastritis "could be caused by alcohol abuse." R. at 20.

In addition to the objective medical evidence, the ALJ considered statements from Mr. Worthen's treating and examining doctors. In particular, he gave partial weight to the opinion of Dr. Langner, mostly because Dr. Dawkins had relied upon it. He noted that Dr. Langner had checked the box marked "moderately limited" in each of the categories listed on the mental residual functional capacity form, and he determined that Dr. Langner's doing so "suggests that [Dr. Langner] did not know how to

complete the form." R. at 21.

Based upon all of this, the ALJ concluded that Mr. Worthen could return to his past relevant work as a laborer, both as previously performed and as generally performed in the national economy. R. at 22. In so concluding, the ALJ adopted the opinion of the VE who testified at the last hearing. With regard to the VE, the ALJ acknowledged that she had testified that all jobs would be precluded if Mr. Worthen had to take unscheduled bathroom breaks, or if he missed considerable work because of his impairments. But, he determined that the record did not support either scenario. *Id.*

6. The Appeals Council's Action & The Lawsuit

After ALJ Bailey issued his January 29, 2004 decision, Mr. Worthen again asked the Appeals Council for review, and, this time, that request was denied. With that, the ALJ's decision became the final decision of the Commissioner. R. at 5-8.

Mr. Worthen then filed this lawsuit, seeking review of the agency's decision and an award of benefits. The parties consented to proceed before a magistrate judge, and the case was reassigned to this Court on December 1, 2004. Thereafter, both parties moved for summary judgment. Plaintiff asks the Court to reverse the Commissioner's final denial of his claim for benefits, or in the alternative, to remand the matter for further

proceedings before an ALJ who has not yet heard the claim.

## Discussion

### A.  Standards of Review

Disability Insurance Benefits are available only to claimants who can establish "disability" under the terms of the Social Security Act.  The social security regulations provide a five-step sequential analysis for determining disability for purposes of eligibility for benefits.  Under the regulations, the ALJ is required to evaluate, in sequence, (1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) whether the claimant can perform her past work; and (5) whether the claimant is capable of performing work in the national economy.  *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000) (citing *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995)).  The claimant bears the burden of proof at steps one through four; at step five, the burden shifts to the Commissioner.  *Id.* (citing *Knight*, 55 F.3d at 313).

A district court reviewing an ALJ's decision under the above analysis must affirm if the decision is free of legal error and supported by "substantial evidence," 42 U.S.C. § 405(g); *Steele*

*v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002); that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)(quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Where, however, "the Commissioner's decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele*, 290 F.3d at 940. In the Seventh Circuit, an ALJ must "build an accurate and logical bridge from the evidence to [his] conclusions so that [the Court] may afford the claimant meaningful review of the SSA's ultimate findings." *Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003). It is not enough that the record contains evidence to support the ALJ's decision; if the ALJ does not rationally articulate the grounds for that decision, the Court must remand. *Steele*, 290 F.3d at 941.

Applying the sequential analysis described above, ALJ Bailey, in his January 29, 2004 decision, found that: (1) Mr. Worthen had not performed substantial gainful activity during the period of alleged disability; (2) his impairments were "severe" within the meaning of the Act, but (3) they did not meet or equal, separately or combined, a listed impairment; and (4) given his limitations and impairments, Mr. Worthen had the residual functional capacity to perform at least one of his past jobs,

that of a laborer. R. at 22-23. The ALJ did not consider step five, and made no findings concerning Mr. Worthen's ability to perform other jobs in the national economy.

B.    Analysis of the Parties' Arguments

In his motion for summary judgment, Mr. Worthen argues that ALJ Bailey's decision should be reversed or remanded because (1) the ALJ improperly ignored entire lines of evidence that were favorable to Mr. Worthen and failed to properly weigh the various medical opinions in the record; (2) the ALJ's credibility determination was not supported by the record; (3) the ALJ failed to analyze the expert psychological opinion evidence as required by the regulations; and (4) the ALJ failed to consider Mr. Worthen's impairments in combination and failed to consider whether he could sustain work activity. The Court will consider each argument below.

1.    The ALJ's Consideration of the Evidence

Mr. Worthen first argues that the ALJ failed to consider certain evidence favorable to him. In particular, Mr. Worthen argues that the ALJ ignored the testimony of Dr. Leigh, the medical expert who testified at the first hearing, and the testimony of Dr. Mond, the medical expert who testified at the third hearing, and that the ALJ ignored the evidence establishing that he continued to experience rectal bleeding and pain, as a

56

result of his pancreatitis and gastritis. *See* Plaintiff's
Memorandum of Law in Support of His Motion for Summary Judgment,
p. 18. Mr. Worthen argues that the ALJ relied upon the testimony
and opinions of Dr. Bernard Stevens, the medical expert from the
last hearing, while ignoring the testimony of Drs. Leigh and
Mond, without providing any explanation for why he was doing so --
without, in fact, even acknowledging that he was doing so. And
the issue is important, Mr. Worthen argues, because Drs. Leigh
and Mond both testified that Mr. Worthen's impairments would
require him to take frequent and relatively long bathroom breaks.
Dr. Stevens, on the other hand, opined that the record did not
support his alleged need to take such breaks.

Mr. Worthen also argues that the ALJ determined that he
suffered from depression, ventral hernia, and substance abuse,
but ignored the evidence showing that Mr. Worthen also suffered
from microangiodysplasia, pancreatitis and an ulcer, and failed
to explain why he thought these impairments had resolved or why
he was not including them in his assessment of what Mr. Worthen
could, and could not, do. *See* Plaintiffs Memorandum of Law in
Support of His Motion for Summary Judgment, p. 20.

The Seventh Circuit has repeatedly admonished that, although
the ALJ need not address each and every piece of evidence, his
decision must be based upon consideration of *all the relevant*

*evidence*, and the ALJ must articulate, at some minimum level, his analysis of the record so that the reviewing court can follow his reasoning. *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988)(italics added). An ALJ may not select and discuss only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994); *Orlando v. Heckler*, 776 F.2d 209, 213 (7th Cir. 1985). Rather, he must confront the evidence that does not support his conclusion and explain why he rejected it. *Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2003).

Contrary to all of this, the ALJ appears to have failed to consider *all* of the medical opinions in the record, and he appears to have failed to weigh the various medical opinions in the face of patent evidentiary inconsistencies. In fact, at the outset of the second administrative hearing, the ALJ acknowledged that he was required to consider the evidence submitted during the first hearing, and he acknowledged his obligation to resolve any disagreements between the medical experts and vocational experts who testified at the two hearings. R. at 628. Yet, the ALJ failed – in all three of his decisions – to discuss conflicting medical expert testimony from the various hearings.

In his final decision, the only decision that is before the Court, the ALJ adopted the opinion of Dr. Stevens, who testified

that (1) neither chronic diarrhea, bladder problems nor severe gastrointestinal tract impairments were supported by the record; (2) that there was no record of severe abdominal pain, and that any pain Mr. Worthen might have would not interfere with work; and (3) that, although, microangiodysplasia and pancreatitis were reflected in the record, there was no evidence that either impairment was currently troubling Mr. Worthen. R. at 573-76. Based upon the testimony of Dr. Stevens, the ALJ concluded that Mr. Worthen's claimed need to take one or more 20-minute unscheduled breaks during the day was unsupported in the record. R. at 22. But, despite what Dr. Stevens said, the record is replete with evidence showing that Mr. Worthen experienced pain and bleeding throughout the relevant time period, and the testimony of record - unrebutted, for the most part, shows that his conditions require him to spend more time in the bathroom than the average person might be expected to spend.

At the first administrative hearing in 1997, the medical expert, Dr. Leigh, testified that Mr. Worthen, indeed, suffers from microangiodysplasia, and that there is no real cure for that ailment, other than removal of part of the colon, which Mr. Worthen never had done. R. at 620. Although this testimony is old, as the Commissioner is quick to point out, testimony to the same effect came in at the third administrative hearing held in

2002, long after the alleged onset date. At that hearing, Dr. Mond, who was testifying as a medical expert, testified that Mr. Worthen suffers from microangiodysplasia, which, although not a severe problem, is not specifically treatable. R. at 476-77. Dr. Leigh testified that the need to take frequent unscheduled breaks up to 20 minutes was consistent with the condition of microangiodysplasia, R. at 622-23, and Dr. Mond testified that, although bleeding did not occur all the time, when it does occur, Mr. Worthen would need extra time in the bathroom. R. at 484. The testimony of these medical experts is clearly at odds with the testimony of Dr. Stevens, who basically declined to even acknowledge Mr. Worthen's condition.

The ALJ neither discussed nor resolved this clear conflict in the evidence. In fact, he did not discuss the testimony of Drs. Leigh and Mond at all. In short, he failed to "confront the evidence that [did] not support his conclusion and explain why it was rejected. *Kasarsky*, 335 F.3d at 543 (7th Cir. 2003).

The Commissioner argues that the ALJ was right to adopt the opinion of Dr. Stevens over the opinion of Dr. Leigh because Dr. Leigh's testimony predated Mr. Worthen's amended onset date by more than three years. First, the ALJ cannot refuse to look at evidence simply because it predates the claimant's alleged onset date. *See Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir.

2004). Second, as noted above, Dr. Mond testified consistently with Dr. Leigh, and he did so two years after the amended alleged onset date. Yet, the ALJ did not discuss Dr. Mond's testimony either. And, finally, the ALJ never said he was rejecting Dr. Leigh's testimony because it was stale; he never discussed it at all. It is therefore inappropriate for the Commissioner to advance this argument for the first time here, in an attempt to retroactively bolster the ALJ's findings. See *Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003)("general principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ"). See also *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002).

At the hearing on May 20, 2003, Dr. Stevens dismissed Mr. Worthen's allegations by saying that, in his view, Mr. Worthen was not then suffering from microangiodysplasia, and that there was no evidence that he was bleeding. And he supported that conclusion by noting that Mr. Worthen had never been diagnosed with anemia. The Commissioner uses this analysis to justify the ALJ's findings concerning the state of Mr. Worthen's health. But, in fact, Mr. Worthen *was* diagnosed as being anemic, and that diagnosis came after the amended alleged onset date: the medical records from Cook County Hospital indicate that, on December 14,

2000, Mr. Worthen was, indeed, suffering from "mild anemia." R. at 396.

Dr. Stevens' opinion that Mr. Worthen's pain and bleeding had resolved also seems to have been misplaced. The medical records covering the post-amended alleged onset date contain numerous references to rectal bleeding, bleeding ulcers, pancreatitis, and severe rectal and abdominal pain. See R. at 388-402. The records show that, on February 1, 2001, Mr. Worthen complained of abdominal pain, R. at 394, and, on June 5, 2001, he complained of bright red rectal bleeding. R. at 391. In a February 21, 2002 letter, Mr. Worthen's treating physician indicated that he was suffering from "longstanding abdominal pain." R. at 383. On September 30, 2002, Mr. Worthen's treating physician noted that he was still experiencing chronic abdominal pain. R. at 407.

Additionally, at the March 7, 2002 hearing, Dr. Mond, the ME, testified that Mr. Worthen's gastritis could cause severe pain, as could his peptic ulcer disease and his pancreatitis, R. at 483; and Dr. Mond conceded that, when it occurs, Mr. Worthen's pain could be distracting. R. at 484. He also conceded that Mr. Worthen's angiodysplasia and his pancreatitis would require him to spend extra time in the bathroom. R. at 484, 486, 488.

Moreover, Mr. Worthen has consistently testified that he

experiences pain and bleeding on an ongoing basis. At the March 7, 2002 hearing, Mr. Worthen testified that his hernia causes him pain, R. at 472; he testified that he has pain and cramps when he has to use the bathroom for bowel movements, R. at 504-05; he testified that he has severe pain two or three times a day, lasting for 10 or 15 minutes each time, and that he experiences rectal bleeding three or four days a week. R. at 504, 505. At the May 20, 2003 hearing, he testified that, because of his hernia, he has pain if he sits or walks for too long, R. at 532-533, he testified that he still has rectal bleeding every three to four days, which causes him to spend up to a half an hour in the bathroom, R. at 543, he testified that, because of his pancreatitis, he has sharp pains that force him to bend over and go into a fetal position, and that this happens three to four times per day and lasts 10-15 minutes each time, R. at 543, and he testified that he has cramping pain from strained muscles after using the bathroom, and that he has to lie in the grass or on a bench for relief after using the bathroom. R. at 544. This testimony is all unrebutted. And, while the ALJ may have been free to disbelieve some or all of this testimony, Dr. Stevens was not.

Contrary to Dr. Steven's assessment, nothing in the record suggested that Mr. Worthen's condition had resolved or abated.

It is true that the record does not include regular medical documentation of his condition, his bleeding and his pain, as it does for the earlier years when Mr. Worthen was seeing Dr. Huynh and Dr. Varkey on a more regular basis. But, by the time of the last hearing, Mr. Worthen had lost his apartment, he was homeless and living in parks and shelters. It would hardly be surprising that he was not making and keeping regular doctors appointments to monitor, track and make a record of, his pain and bleeding. There are no medical records from this time period, however, stating that he no longer suffered from microangiodysplasia and pancreatitis or the bleeding and pain that go along with those impairments.

In short, Dr. Stevens was wrong about the record, and the ALJ's decision to adopt his findings wholesale – especially without explanation – constitutes error. *Lopez ex. rel. Lopez v. Barnhart*, 336 F.3d 535, 540 (7th Cir. 2003)(holding that the ALJ erred when finding no evidence of a condition when the record establishes some evidence, even if limited). At the end of the day, the record shows that Mr. Worthen suffers from a combination of impairments that cause him pain, and cause him to spend extra time in the bathroom; these impairments affect his daily activities and affect his ability to hold down a job. And the only person who didn't see that, was Dr. Stevens. Yet the ALJ

adopted Dr. Stevens' testimony and opinions, without at least explaining why he was crediting this testimony over that of the other experts who testified at the various hearings held in Mr. Worthen's case.

## 2. The ALJ's Credibility Determinations

Mr. Worthen next argues that the ALJ's determinations concerning credibility are deficient. Initially, the Social Security Regulations provide that, when assessing an individual's credibility, the ALJ must consider the claimant's activities of daily living; the location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate or aggravate the symptoms; what medications the claimant takes to alleviate pain or other symptoms, in what dosage, and with what effectiveness and side effects; what treatment, other than medication, the claimant undergoes or has undergone to alleviate pain or other symptoms; measures other than treatment that the claimant uses or has used to relieve pain or other symptoms; and other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. See Social Security Ruling 96-7p, Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, 61 Fed. Reg. 34483-01 (July 2, 1996). ALJ Bailey cited this regulation, and he stated that he assessed Mr. Worthen's credibility within

the guidelines specified therein. But the Court is left to take the ALJ at his word on that, because he did not include any analysis or other information that would enlighten the Court – or anyone else reading the decision – about whether he considered any of the factors identified in the regulation, or, if he did, what he might have thought about them. He stated only that he found Mr. Worthen's allegations – he does not say which allegations – to be "partially credible in light of the medical record." R. at 20. Thus, contrary to what he said, it is not at all clear that the ALJ actually considered any of the factors articulated in SSR 96-7p.

Generally speaking, because the ALJ is in the best position to see and hear witnesses, the Court will defer to the ALJ's credibility findings unless the claimant shows that they are "patently wrong." *Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir. 2000). Where, however, a particular credibility finding "rests on objective factors or fundamental implausibilities rather than subjective considerations such as a claimant's demeanor," it is entitled to less deference, and the Court has greater freedom to review the decision. *Clifford v. Apfel,* 227 F.3d 863, 872 (7th Cir. 2000). Furthermore, if the claimant indicates that pain is a significant factor limiting his ability to work, the ALJ is required to "investigate all avenues presented that relate to

pain," including such factors as "the nature and intensity of the pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for the relief of pain, functional restrictions, and the claimant's daily activities. *Clifford,* 227 F.3d at 869 (citing *Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994)). When it comes to subjective complaints, including complaints of pain, the Seventh Circuit has held that an ALJ must "articulate specific reasons for discounting a claimant's testimony as being less than credible," and that an ALJ is precluded "from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding." *Schmidt v. Barnhart*, 393 F.3d 737, 746-47 (7th Cir. 2005)(quoting *Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003); *Knight v. Chater,* 55 F.3d 309, 314 (7th Cir. 1995)).

Here, it appears that the ALJ believed that the objective medical evidence did not support Mr. Worthen's allegations concerning pain and the need to use the bathroom. But, at a minimum, he should have explained that. And he did not. Thus, the Court is left to assume that the ALJ chose to partially disbelieve Mr. Worthen simply because he felt that the objective medical evidence was not sufficiently negative to explain Mr.

67

Worthen's pain. That is improper.

As Mr. Worthen correctly points out, the ALJ determined that his subjective complaints regarding his functional limitations were "partially credible for the reasons set forth in the body of the decision." R. at 22. Yet, the body of the decision says essentially nothing about the issue. In the decision, the ALJ simply acknowledges that he is required to assess Mr. Worthen's credibility because of the subjective nature of his allegations, states that he has assessed Mr. Worthen's credibility within the provisions of 20 CFR §§ 404.1529 and 416.929, as well as Social Security Ruling 96-7p, and states his conclusion that Mr. Worthen's allegations are "partially credible in light of the medical record." R. at 20. He then notes that Mr. Worthen was largely candid about his alcohol abuse, and that he admitted to suffering relapses with his drinking, though it is not entirely clear that these latter statements are a basis for the "partially credible" conclusion. And even if they were, this would fall far short of what is required under the regulations cited by the ALJ.

In assessing a claimant's credibility, the ALJ must evaluate the claimant's description of symptoms by citing "specific reasons" for a credibility finding; a credibility evaluation may not stand if the ALJ does no more than cite rule 96-7p without supplying any of the details demanded by that provision. *Steele,*

290 F.3d at 941-42. And, although it is true that the ALJ need not discuss each and every credibility factor set forth in the regulation, he must at least provide sufficient support for his credibility finding to allow the court to "trace the path" of his reasoning. *Johansen v. Barnhart*, 314 F.3d 283, 288 (7th Cir. 2002). In this case, the ALJ did not do so. The issue is important because if Mr. Worthen's testimony is believed, if, as he consistently testified, he really did need to spend significant chunks of time in the bathroom on an unpredictable, and often urgent basis, then, as every vocational expert who testified in this case conceded, he would be precluded from working.

The Commissioner argues that much of the evidence regarding pain and bleeding predated Mr. Worthen's alleged onset date; the Commissioner also notes that, despite his impairments, Mr. Worthen was able to engage in substantial gainful activity, at times, up until October 2000. But the Seventh Circuit has instructed that evidence from the period before an alleged onset date is still indicative of an impairment, and that working is not necessarily inconsistent with a claim of disability. *Golembiewski*, 322 F.2d at 916; *Henderson*, 349 F.3d at 435. Thus, at a minimum, the ALJ should have considered this evidence in assessing Mr. Worthen's credibility.

3. The ALJ's Assessment & Resolution of
   the Conflicting Mental Health Evidence

Mr. Worthen next challenges the way in which the ALJ
assessed (or not) and resolved (or not) conflicts in the evidence
relating to Mr. Worthen's mental health – especially conflicts
between the report of Dr. H. Langner, who examined Mr. Worthen at
the behest of the Social Security Administration, and Dr. Marva
Dawkins, who testified at the last hearing. The ALJ acknowledged
that he "considered statements from treating and examining
physicians in assessing the claimant's residual functional
capacity, as required by 20 C.F.R. §§ 404.1527 and 416.927 and
Social Security Ruling 96-2p." R. at 21. However, as was the
case regarding Mr. Worthen's credibility determination, the ALJ
did little more than cite the regulations that he was required to
apply, without actually applying them.

The record in this case contains three sets of mental health
evidence, one dating from 1996, and two dating from 2003. First,
on March 25, 1996, Dr. Beverly Purdy of Chicago Consulting
Physicians, evaluated Mr. Worthen; she looked at the evidence in
the file and she actually interviewed and evaluated Mr. Worthen.
R. at 251. According to her report, Dr. Purdy believed that Mr.
Worthen had a "fairly low fund of information"; he was slow to
come up with the date, had difficulty following directions, had

70

trouble performing basic addition and naming three large cities, and had difficulty with short term memory and concentration. R. at 253-54. Dr. Purdy also opined that Mr. Worthen would have "some difficulty dealing with people on an interpersonal basis." R. at 254. Shortly after Dr. Purdy completed her evaluation, on April 12, 1996, Dr. E. Kuester, a medical consultant for the agency, completed a mental RFC for Mr. Worthen, indicating that Mr. Worthen was "moderately limited" in five out of twenty categories, including the ability to understand and remember detailed instructions, the ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods, the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and the ability to interact appropriately with the general public. R. at 256-57. Dr. Kuester determined that Mr. Worthen should not have to deal with the public, but that he could perform, and cope with the demands involved with, unskilled work. R. at 258. A notation at the end of Dr. Kuester's assessment indicates that another doctor, Dr. Donald MacLean, reviewed the evidence in the file and affirmed the assessment. R. at 259. On balance, the evidence in this first set suggests that Mr. Worthen has some mental issues

71

or deficiencies that might affect his ability to work.

The next piece of evidence is the March 5, 2003 Mental Residual Functional Capacity Assessment Form completed by Dr. Langner, who also examined Mr. Worthen; Dr. Langner found Mr. Worthen to be "moderately limited" in all twenty areas identified on the form. R. at 408-415. Although Dr. Langner did not write any explanations for his check marks on the MRFC assessment form itself, he did include a narrative report, in which he noted, *inter alia*, that: Mr. Worthen's affect was somewhat flat; he had trouble with immediate and long-term memory, he could not name five large cities, he said there were 365 weeks in a year and twenty nickels in $1.15, and he was unable to subtract serial sevens. R. at 409-410. As part of his multi-axial assessment of Mr. Worthen, Dr. Langner scored Mr. Worthen at 50 on the Global Assessment of Functioning Scale, R. at 411; this score indicates that, in Dr. Langner's estimation, Mr. Worthen exhibited "**[s]erious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job). *See* Diagnostic and Statistical Manual of Mental Disorders, 4th Edition, p. 32. Neither Dr. Purdy, nor Dr. Kuester gave Mr. Worthen a GAF score, so this is the only such score in the record. This piece of evidence is the most

72

favorable to Mr. Worthen in the sense that it reflects the most serious mental impairments and the most serious consequences for his ability to work.

Then, in addition to this evidence, the record includes the testimony of Dr. Marva Dawkins, who testified at the hearing on May 20, 2003, but never separately interviewed or evaluated Mr. Worthen. According to Dr. Dawkins, Mr. Worthen was "moderately limited" in only two areas of the MRFC assessment form – significantly, one being his ability to complete a normal workday and workweek and to perform at a consistent pace without an unreasonable number and length of rest periods. R. at 563. Dr. Dawkins opined that Dr. Langner's mental RFC assessment was not supported by the medical evidence, though she did not really elaborate, and she said nothing about the GAF score. R. at 559-60. She indicated that, instead, she would rely on the more recent records from Mr. Worthen's one documented bout of depression in 2003, which required medical intervention and unquestionably interfered with his ability to function. R. at 567. She basically concluded that, because he was only hospitalized once for depression, it wasn't a serious issue in terms of assessing his ability to work.

It is unclear whether the ALJ considered the evidence from 1996 from Dr. Purdy and Dr. Kuester. He did consider Dr.

Langner's report, as well as Dr. Dawkins' testimony and the hospitalization records, and he indicated that he would credit the latter over the former. Curiously, the ALJ indicated that he would assign only partial weight to Dr. Langner's opinion because his checking of all of the boxes suggested that Dr. Langner did not know how to complete the form. R. at 21. The ALJ did not elaborate, and the Court therefore has no idea what parts of Dr. Langner's report he actually credited and which he disregarded. And the ALJ did not explain how he arrived at the conclusion that checking all of the boxes reflects an ignorance of the form, as opposed to reflecting the belief that Mr. Worthen was actually limited in all areas.

A cursory review of the mental health evidence in the record shows that Mr. Worthen was getting worse in this regard. It seems odd, therefore, to imagine that Mr. Worthen actually *improved* by 2003; yet this is exactly what Dr. Dawkins suggests with her assessment that he was moderately limited in fewer areas than he was in 1996 – this, despite the fact that, for the first time, he was hospitalized because of his mental impairments.

The Commissioner has offered a number of reasons for why the ALJ properly adopted Dr. Dawkins' opinion over Dr. Langner's. She argues, for example, that, as Dr. Dawkins pointed out, Dr. Langner's report was shaky because he failed to include an Axis

II diagnosis and failed to make any reference to Mr. Worthen's extensive history of substance abuse, and because the narrative portion of his report does not comport with his conclusion that Mr. Worthen was moderately limited in every area. And all of these might constitute valid reasons for crediting one opinion over another. But, as Mr. Worthen correctly points out, "general principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ." *Golembiewski,* 322 F.3d at 916; *see also Steele,* 290 F.3d at 941. In his decision, the ALJ stated that he gave Dr. Langner's report "partial weight" simply because he checked the "moderately limited" box in all twenty categories of the form. R. at 21. In short, the ALJ determined, without any real evidence, and certainly without any input from Dr. Langner, that the results of the MRFC were unreliable based solely on his speculation that Dr. Langner – who evaluated Mr. Worthen because the agency asked him to, presumably because of his expertise – did not know how to fill out the form the agency provided to him.

Also troubling is the fact that the ALJ indicated, based upon Dr. Langner's report, that Mr. Worthen's 2003 mental status examination was "essentially normal." R. at 19. Having read the report, this Court is left to wonder what the ALJ could have been

thinking when he reached this conclusion; nothing about the report suggests that Mr. Worthen's condition was "essentially normal." As previously noted, Dr. Langner found that Mr. Worthen's affect was somewhat flat, that he had difficulties with numerous mental functioning questions (digit and subject recall, naming cities, differentiating between a tree and a bush, performing serial sevens, naming the presidents, etc). R. at 409-410. Dr. Langner certainly does not use the word "normal," and his diagnosis, which includes a dysthymic disorder diagnosis as well as the relatively serious Global Assessment of Functioning score of 50, would seem to fall outside the range of "normal."

4.    The ALJ's Failure to Address the
       Combination of Mr. Worthen's Impairments

Finally, Mr. Worthen argues that the ALJ considered Mr. Worthen's mental or psychiatric impairments, but did not consider how his physical impairments – his pain, and his microangiodysplasia, which required him to use the bathroom frequently and often urgently – would affect his ability to hold down a job. The ALJ failed, according to Mr. Worthen, to make any findings concerning whether Mr. Worthen would be distracted by his pain, or whether and to what extent he would need to take bathroom breaks. This is not quite true. In fact, the ALJ

76

determined that Mr. Worthen was not experiencing pain at the time, and that his allegations about bathroom use were not supported by the record. Although Mr. Worthen might reasonably question these findings - and the Court has done so above, they certainly explain why the ALJ did not make specific findings about these issues.

## C.   The Appropriate Remedy - Reversal vs. Remand

Given the errors noted above, the Court will grant Mr. Worthen some type of relief; the only remaining question is whether the case should be remanded for further proceedings, to give the Commissioner and the ALJ yet another chance to get things right, or whether the Court should simply award benefits.

Courts have discretionary power to enter, upon the pleadings and transcripts of the record, a judgment affirming, modifying or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. 42 U.S.C. §405(g). But, generally, a judicial award for benefits is proper only when all essential factual issues have been resolved and the record clearly establishes that the plaintiff is entitled to benefits. *INS v. Ventura*, 537 U.S. 12, 16; *see also Campbell v. Shalala*, 988 F.2d 741, 744 (7th Cir. 1993).

In this case, the agency has had three chances to get things right, and it has failed. Largely (though not entirely) as a

result of the ALJ's errors and omissions, Mr. Worthen's application for benefits has been pending for almost a decade, he has been dragged down to testify four times already and the Court sees no reason to drag him down again. From the record evidence, it is clear that Mr. Worthen suffers from a combination of impairments that unquestionably affect his ability to hold down a job. Even if one believed only a small part of what Mr. Worthen said at the hearings, there is no question that he experiences pain and that he is required to spend an inordinate amount of time in the bathroom. Putting aside what he can lift and carry, pull and push, he simply cannot keep to the schedule a workday demands, and every single vocational expert testified as much.

Mr. Worthen attended four administrative hearings, which led to three decisions and two remand orders from the Appeals Council, with numerous and repeated instructions for the ALJ to follow. The ALJ failed to apply the agency's rules and regulations, and he failed to honor the instructions given to him (twice) on remand from the Appeals Council. All of which suggests that the case should be remanded, not for further proceedings, but for the sole purpose of awarding benefits. *See* *Wilder v. Apfel*, 153 F.3d 799, 804 (7th Cir. 1998).

In *Alexander v. Barnhart*, the district court expressed concern and dismay about a claimant who had to endure two rounds

of hearings and whose application for benefits had been pending for more than five years. 287 F. Supp.2d 944, 967 (E.D. Wis. 2003). Mr. Worthen has endured four rounds of hearings,[1] and his application has been pending for more than nine years. The Commissioner is not entitled to endless opportunities to "get it right," see Brisco ex. rel. Taylor v. Barnhart, 309 F.Supp 2d 1025, 1041 (N.D. Ill. 2004), and the time has come to close this case and award Mr. Worthen the benefits to which he is entitled.

## Conclusion

For the reasons set forth above, the Court grants Mr. Worthen's motion for summary judgment, denies the Commissioner's motion for summary judgment, and remands the case for the sole purpose of awarding benefits consistent with the amended onset date of October 11, 2000.


Dated: September 6, 2005

ENTER:

Arlander Keys
ARLANDER KEYS
United States Magistrate Judge

---

[1] Though of course one of those rounds was because the ALJ originally assigned to the case died, a sad occurrence for which the Court certainly does not blame ALJ Bailey or the Commissioner.

79